2009-02498
FILED
August 01, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001997256

1  MARK B. ALDRICH, ESQ. (BAR NO. 190951)
**ALDRICH LAW GROUP** LLP
2  303 Twin Dolphin Drive
Sixth Floor
3  Redwood City, California 94065
Telephone: (650) 632-4218
4  Facsimile: (650) 292-0719

5  Attorneys for **Plaintiff**
Mission Oaks Development, LLC

6

7

8  **UNITED STATES BANKRUPTCY COURT**

9  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  MISSION OAKS DEVELOPMENT, LLC, a          ) CASE NO. 09-23892-B-7
California limited liability company,        )
12                                            ) ADV. CASE NO.:
         Plaintiff,                           )
13                                            ) COMPLAINT OF CREDITOR MISSION
    v.                                        ) OAKS DEVELOPMENT, LLC
14                                            ) OBJECTING TO DISCHARGEABILITY
XTREME HOMES, LLC, a California limited       ) OF DEBT
15  liability company; TIMOTHY JOSEPH         )
SCHMIDT, an individual, and JANET             )
16  LOUISE RUSTICI, an individual             ) Assigned to: Hon. Thomas C. Holman
                                              )
17  DOES 1 through 100 inclusive,             )
                                              )
18         Defendants.                        )
                                              )
19                                            )
                                              )

20  TO THE HONORABLE THOMAS C. HOLMAN AND TO ALL PARTIES AND THEIR

21  COUNSEL OF RECORD:

22       Mission Oaks Development, LLC, the Plaintiff in the within adversary proceeding and

23  creditor in the within Chapter 7 Case, ("MOD"), respectfully alleges as follows:

24                     **JURISDICTIONAL ALLEGATIONS**

25       1.   This is an adversary proceeding within the meaning of Federal Rules of

26  Bankruptcy Procedure, Rule 7001(4) and (6).

27       2.   This Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C.

28

Aldrich Law Group LLP

§§ 151, 157, and 1334, 11 U.S.C. §§ 105, 523, 727, and 1141, as well as the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of California and the Local Rules for the United States District Court for the Eastern District of California.

3. Venue is proper in this Court under 28 U.S.C. § 1409 as this adversary proceeding arises under and in connection with a case under Title 11 which is pending in this District.

4. This action is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (I), (J), and (O).

5. MOD is informed and believes and on that basis alleges that the defendant herein, Xtreme Homes, LLC ("XTH") is a limited liability company formed and operating under the laws of the State of California and which is presently, and since the date of the filing of this Chapter 7 Case has had its principal place of business within the Eastern Judicial District of California and is subject to the jurisdiction of this Court.

6. MOD is informed and believes and on that basis alleges that defendant herein Timothy Joseph Schmidt ("Schmidt") is an individual who is, and who since the date of the filing of this Chpater 7 Case has resided within the Eastern Judicial District of California and is subject to the jurisdiction of this court.

7. MOD is informed and believes and on that basis alleges that defendant herein Janet Louise Rustici ("Rustici")(collectively referred to with Schmidt and XTH as "Defendants") is an individual who is, and who since the date of the filing of this Chpater 7 Case has resided within the Eastern Judicial District of California and is subject to the jurisdiction of this court.

## GENERAL ALLEGATIONS

8. Defendants commenced this bankruptcy case by filing a voluntary petition under Chapter 7 of Title 11 of the United States Code on March 6, 2009.

9. MOD is informed and believes and on that basis alleges that Defendants were in the business of manufacturing modular homes and who regularly conducted business in Butte

Aldrich Law Group LLP

County, California.

10. MOD is informed and believes and on that basis alleges that Schmidt and Rustici were the sole members of XTH and used XTH business assets and accounts for their own personal gain to the detriment of their clients.

11. MOD is a limited liability company formed and operating under the laws of the State of California.

12. MOD is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. MOD will amend this complaint to allege their true names and capacities when ascertained. MOD is informed and believes and thereon alleges that each of the defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to, and thereby proximately caused damages to MOD as herein alleged.

13. MOD is informed and believes and on that basis alleges that at all times mentioned, the Defendants, and each of them, were the agent of each of the remaining Defendants, and were, at all times mentioned, acting within the scope of such agency.

14. MOD is informed and believes and on that basis alleges that the Defendants, and each of them, were the alter-egos of the other Defendants in that such a unity of interest exists and corporate formalities were not maintained and other actions taken so as to render each Defendant one and the same with the remaining Defendants.

15. On or about May 21st 2008, MOD and XTH entered into a written contract wherein XTH was to design and construct a custom home by building components of the home on XTH premises, which components would be shipped to the final home address for assembly (the "Agreement").

16. In furtherance of the Agreement, MOD paid the Defendants approximately $140,000.

17. XTH has wholly failed to deliver on its contractual obligations.

18. MOD is informed and believes and on that basis alleges that the Defendants

knew, as of May 21st, 2008, that XTH was insolvent and the Defendants knew that they could not perform under the terms of the Agreement.

19.     MOD is informed and believes and on that basis alleges that at the time Defendants coerced MOD to pay them $140,000, Defendants knew that they intended to use MOD funds to satisfy other XTH debts and personal debts then outstanding.

20.     MOD is informed and believes and on that basis alleges that the Defendants, both before and after May 21st, 2008, intended to and, in fact did use MOD funds to complete a personal construction project and to satisfy personal debt obligations.

21.     MOD is informed and believes and on that basis alleges that Defendants intended to induce MOD into a contract for the purpose of defrauding MOD of $140,000.

22.     MOD relied justifiably upon the Defendants' contractual promises made on or about May 21, 2008, and did so to their detriment.

23.     MOD has repeatedly demanded return of its deposit and contractual payment and has received neither from the Defendants.

## FIRST CLAIM FOR RELIEF

For Debt to be Determined Non-Dischargeable Pursuant to 11 U.S.C. § 523 (a)(2)(A)

24.     MOD repeats the allegations on paragraphs 1 – 23 as though fully set forth herein.

25.     MOD is informed and believes and on that basis alleges that the Defendants made materially false representations regarding their ability to perform under the terms of the Agreement in order to induce MOD to transfer to them $140,000.00 to wit, the Defendants represented to MOD that it could and would adequately perform under the terms of the Agreement and that MOD funds would be used solely for the Defendants' performance under the terms of the Agreement.

26.     MOD is informed and believes and on that basis alleges that the Defendants knew they would be unable to perform under the terms of the Agreement at the time the materially misleading statements were made to MOD and knew that the Defendants would use

MOD funds to satisfy other business and personal debts with no way to satisfy their obligations under the Agreement.

27.     MOD is informed and believes and on that basis alleges that at the time the Defendants made these materially misleading statements to MOD, they did so with the intent to induce MOD to transfer to the Defendants $140,000 the Defendants could use to satisfy other business and personal debts.

28.     MOD relied upon the Defendants materially misleading statements when it agreed to the terms of the Agreement and transferred to MOD $140,000.

29.     MOD has been damaged in an amount not less than $140,000, according to proof at trial.

## SECOND CLAIM FOR RELIEF

For Debt to be Determined Non-Dischargeable Pursuant to 11 U.S.C. § 523(a)(4)

30.     MOD repeats the allegations contained in paragraphs 1 – 29 as though fully set forth herein.

31.     MOD is informed and believes and on that basis alleges that following MOD's payment to Defendants of $140,000, Defendants owed MOD a fiduciary duty of good faith and fair dealing.

32.     MOD is informed and believes and on that basis alleges that Defendants made numerous payments to themselves or paid personal debts for their own benefit.

33.     MOD is informed and believes and on that basis alleges that such payments by the Defendants are totally unexplained by Defendants and, upon information and belief, were unauthorized and illegal.

34.     By reason of the foregoing, MOD has been damaged in an amount to be determined at trial, but in no event less than $140,000.00.

35.     Accordingly, MOD is entitled to a judgment against the Defendants, and each of them, that the debt owing by the Defendants to MOD is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) which debt is believed to be in excess of $140,000, and which will be

determined at the time of trial in this matter plus exemplary damages in a sum in excess of $1,000,000 as the conduct of the Defendants herein demonstrates reprehensible conduct and motives and such wanton dishonesty as to imply a criminal indifference to civil obligations.

## THIRD CLAIM FOR RLIEF

For Objection to Dischargeability of Debt Based upon Debtor's Willful and Malicious Injury to Another Entity and/or to the Property of Another Entity pursuant to 11 U.S.C. 523 (a)(6)

36.     MOD repeats the allegations contained in paragraphs 1 – 35 as though fully set forth herein.

37.     MOD is informed and believes and on that basis alleges that MOD's payment to the Defendants was intended for the specific purpose of constructing a modular home for MOD.

38.     MOD is informed and believes and on that basis alleges that the Defendants were only authorized to utilize MOD's capital for the legitimate business purposes as outlined in the Agreement.

39.     MOD is informed and believes and on that basis alleges that as a result of the Defendants' conduct described hereinabove, the Defendants exercised unauthorized dominion and control over MOD's assets.  The Defendants' unauthorized dominion and control over MOD assets interfered with MOD's rights thereto.

40.     MOD has made numerous demands on the Defendants for the return of their funds and the Defendants have refused and failed, without right, to return said sums to MOD.

41.     By reason of the foregoing, MOD has been damaged in an amount to be determined at trial, but in no event less than $140,000.00.

42.     Accordingly, MOD is entitled to a judgment against the Defendants setting forth that the debt owing by the Defendants to MOD is non-dischargeable pursuant to 11 U.S.C. 523(a)(6) which debt is believed to be in excess of $140,000 and punitive damages in an amount which will be determined at the time of trial in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Mission Oaks Development, LLC hereby demands as follows:

1. For a judicial determination that the debts owing to MOD by the Defendants are non-dischargeable upon one or more of the grounds set forth herein and the amount of said debt, including, but not limited to, punitive damages;

2. For damages on the First, Second and Third Claims for Relief in the sum in excess of $1,000,000 and which will be determined at the time of trial in this matter;

3. For a judicial determination that the Defendants be denied their discharge upon one or more of the grounds asserted herein;

4. For punitive damages in an amount to be determined at trial, but in no event less than $1,000,000;

5. For pre-judgment interest at the legal rate;

6. For attorneys' fees and costs of suit; and

7. For such other and further relief as this Court deems just and proper.

Dated: July 31, 2009              ALDRICH LAW GROUP LLP

_____
Mark B. Aldrich, Esq.
Attorney for Plaintiff
Mission Oaks Development, LLC

**EXHIBIT A**



**DESIGN CONTRACT**

**THIS AGREEMENT**, Made as of **May 21ˢᵗ**, In the Year of **2008**,

Between the
General Contractor:  **Mission Oaks Development, LLC**
                     **3001 Bridgeway Boulevard**
                     **Suite K-255**
                     **Sausalito, CA 94965**

And the Designer:    **XtremeHomes, LLC**
                     **4801 Feather River Boulevard**
                     **Suite 17**
                     **Oroville, CA 95965**
                     **(530) 230-4933**

For the Project:     **Project Oak Main Residence**
                     **3,972 Sq. Ft. Main House Residence**
                  *6 7* ~~69-57~~ **Locke Court**
                     **Sonoma, CA 95476**
                     **APN #: 056-562-011**

**ARTICLE 1.    CONTRACT DOCUMENTS**

**1.1**    The contract documents consist of this agreement, specifications, payment schedule, information disclosure statement, all addenda issued prior to execution of this agreement and all change orders or modifications issued and agreed to by both parties. This contract document represents the entire agreement of both parties and supersedes any prior oral or written agreement.

**ARTICLE 2.    SCOPE OF WORK**

**2.1**    The General Contractor agrees to purchase and XtremeHomes herein after referred to as the Designer agrees to prepare a set of CAD construction development documents including structural engineering ready for submission to governmental agencies for the 3,972 sq. ft. main house residence in Sonoma, California.

Not included in the scope of work is any site specific engineering e.g. survey, civil engineering, geo-technical, tree surveys, artifact surveys, etc. However, some of these documents will be required before the Designer can proceed with the Construction and engineering documents.

Hard copy and/or electronic documents of current plans will be forwarded to XtremeHomes design department and these documents will be converted to CAD files as a base for the project.

**ARTICLE 3.    CONSTRUCTION DOCUMENT DEVELOPMENT**

**3.1**    Construction documents shall consist of the following:  floor plans, elevations, details and sections (interior and exterior), specifications where necessary, electrical, Title 24, roof

Initialed by: Owner_____

Design Contract
Project Oak Main House
Page 2 of 3

framing details, truss design and calculations (wet stamped) if applicable, structural engineering (wet stamped) foundation plans and shop drawings where necessary.

**3.2**     We understand that the goal of this project is to get the project into production within the next 25 days.

**3.3**     The final meeting shall consist of the owner receiving the completed plans.  The final construction documents shall consist of 3 (three) complete sets of the construction documents ready for submission to governmental agencies and PDF's that can be fully reproduced at any reprographics company.

**3.4**     The cost of the construction documents is $7,944.00.

**3.5**     Before construction document production begins, a deposit of fifty percent (50%) of architectural is required or $3,972.00.  At the receipt of the construction documents the remaining fifty percent (50%) balance of $3,972.00 is due and payable upon receipt.

**3.6**     At the receipt of final plans the owner shall pay Designer, for the final amount due plus any pre-agreed upon additional services and/or reimbursable expenses accrued. Complete payment is due upon receipt of the finalized construction documents.

## ARTICLE 4.    CHANGE ORDERS

**4.1**     A Change Order is any change to the original plans and/or specifications outlined in the Construction Documents.  All change orders need to be agreed upon in writing, including cost, additional time considerations, approximate dates, a legal description of the location where the work will be done and signed by both parties.

## ARTICLE 5.    ARBITRATION OF DISPUTES

**5.1**     Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## ARTICLE 6.    TERMINATION OF THE CONTRACT

**6.1**     Should the Owner or Designer fail to carry out this contract, with all of its provisions, the following options and stipulations shall apply:

 **6.1.1** If the Owner or the Designer shall default on the contract, the non-defaulting party may declare the contract is in default and proceed against the defaulting party for the recovery of all damages incurred as a result of said breach of contract, including a reasonable attorney's fee.  In the case of a defaulting Owner, the Earnest money herein mentioned shall be applied to the legally ascertained damages.

 **6.1.2** In the event of a default by the Owner or Designer, the non-defaulting party may state his intention to comply with the contract and proceed for specific performance.

 **6.1.3** In the case of a defaulting Owner, the Designer may accept, at his option the earnest money as shown herein as liquidated damages, should earnest money not cover the expenses to date, the Contractor may make claim to the Owner for all work executed and for proven loss with respect to equipment, materials, tools,

Initialed by: Owner_____

*14.1*

Design Contract
Project Oak Main House
Page 3 of 3

construction equipment and machinery, including reasonable overhead, profit and
damages applicable to the property less the earnest money.

### ARTICLE 7.    ATTORNEY FEES

**7.1**    In the event of any arbitration or litigation relating to the project, project
performance or this contract, the prevailing party shall be entitled to reasonable attorney
fees, costs and expenses.

### ARTICLE 8.9    ACCEPTANCE

**Mission Oaks Development, LLC**

Christopher Parkes
_Name_
President and CEO
_Title_

_Signature_

22 May 2008
_Date_

**Designer**
**XtremeHomes, LLC**

Tim Schmidt
_Name_
President
_Title_

_Signature_

May 21, 2008
_Date_

ARTICLE 8. INTELLECTUAL PROPERTY

8.1 ALL INTELLECTUAL PROPERTY, INCLUDING THE
CONSTRUCTION DOCUMENTS DEFINED IN SECTION
3.1 ABOVE, IS THE SOLE PROPERTY OF THE CLIENT.
UPON COMPLETION OF THE PROJECT, ALL
CONSTRUCTION DOCUMENTS WILL BE DELIVERED
IN DWG FORMAT AND/OR OTHER NATIVE FORMAT.

Initialed by: Owner_____

**XTREME** XtremeHomes, LLC
4801 Feather River
Boulevard
Suite 17
Oroville, CA 95965
530-625-4551 - Office
530-625-4368 - Fax

# PURCHASE CONTRACT

Office Use Only

| PURCHASER | | |
|---|---|---|
| **Name:** | Chris Farkas | |
| **Company:** | Mission Oaks Development, LLC | |
| **Address:** | 3001 Bridgeway Blvd. | |
| **Address:** | Suite K-255 | |
| **City, State, Zip:** | Sausalito, CA 94965 | |
| **Office Phone:** | (415) ~~364-0020~~ 218 - 7418 | |
| **Home Phone:** | | |
| **Email:** | | |

| FINANCING | | |
|---|---|---|
| Source of Funds: | Cash ☒ | |
| | Builders Loan ☒ | |
| | Direct Loan ☐ | |
| Lender Info | | |
| Institution: N/A | | |
| Contact Name: N/A | | |
| Address: | | |
| Address: | | |
| City, State, Zip: | | |
| Office Phone: | | |
| Email: | | |

**PAYMENT TERMS**
25% Deposit due at signing. 25% due when production starts. 25% due at 50% completion. 25% due at delivery. Any change orders are due immediately.

**DELIVERY REQUEST**
Requested Date: July 15, 2008

**SITE DIRECTIONS**

| APN #: | 056-562-011 |
|---|---|
| Street Address: | |
| Lot & Block No. | |
| County: | |
| City & State: | |
| Shipping Distance (Miles): | Buyer contracts for delivery |

**MISCELLANEOUS**

| | |
|---|---|
| | |

---

**INFORMATION**

| Project Ref #: | P.O. Number: |
|---|---|

**Model:** Custom Design supplied by customer

**Plan ID Number:** N/A    **Elevation:** N/A

☐ **Slab**

☐ **Basement**

☒ **Crawl Space**

VILLA
2,782 SF ~~Guest House~~ Modules to drywall mud & tape phase

1,190 SF Prefab Floors & Wine Cellar
INCLUDING INSTALLATION OF CLIENT SUPPLIED WINDOWS AND DOORS

| PRICE COMPUTATION | |
|---|---|
| 1. Base Package Price: | $204,186.00 |
| 2. Prefab Components: | $11,834.00 |
| 3. Other Options: | Included |
| **4. Sub-total Package:** | **$216,020.00** |
| 5. Taxes: | Reseller Permit Required |
| 6. Freight Allowance: | Under separate contract |
| 7. Permits: | Paid separately by buyer |
| 8. Labels: | Included |
| 9. Field Installation Allowance: | Under separate contract |
| 10. Other: | |
| **11. Total Price:** | **$216,020.00** |
| 12. Less Order Deposit: | $54,005.00 |
| 13. Less Other Deposits: | |
| 14. Other: | |
| **15. Total Un-paid Balance:** | **$162,015.00** |

**PRICING POLICY & ACCEPTANCE**

The price as reflected in the price computation section as shown above is good for a period of thirty (30) days from the date shown below. If the home being purchased does not ship within that ninety (90) day period, ~~regardless of the reason,~~ the contract may be re-priced at prevailing *prices*. Purchaser represents and warrants to XtremeHomes, LLC that he has read the Terms and Conditions of Sale, understands and agrees to the covenants, terms and conditions of contract and confirms the accuracy of the information entered on the purchase contract. Purchaser understands and agrees that XtremeHomes, LLC shall have no obligations hereunder unless and until contract acceptance and credit approval has established.

Prices and terms specified are estimates and are not legal until contract acceptance.
BECAUSE OF CLIENT DELAYS

DATE: May 21, 2008

FORECAST~~ED DELIVERY DATE~~: July 15, 2008

BY: _[signature]_

BY: _Christopher Farkas, 22 May 2008_

2.1
Page 1 of 2

**XtremeHomes, LLC**
**Terms and Conditions of Sale**

1   **Recital.** XtremeHomes, LLC, hereinafter referred to as "XtremeHomes," agrees to sell to the Buyer the goods described on the Purchase Contract and any accompanying documents thereto attached. For the purchase contract to be valid it must be accompanied by a signed copy of the floor plan, elevation and specifications ~~appropriate to the model selected or custom floor plan and elevation created by the XtremeHomes design group.~~

2   **Definition of Days.** Whenever the term "days" is used in this Agreement, the meaning is to be construed as business days, exclusive of weekends and holidays.

3   **Approval.** The Purchase Contract is subject to approval by an officer of XtremeHomes and for it to be valid it must be countersigned by said officer. A signed copy of the order will be acknowledged within five (5) days of its receipt at XtremeHomes corporate offices.

4   **Purchase Price.** Prices as reflected in standard price manuals are delivered to Buyers jobsite. Prices are valid for a period of thirty (30) days from the date of the execution of this Agreement if the project is held up by the Buyer and the goods have not been paid for or delivered because of Buyers delay, XtremeHomes may change the price of the purchase contract to reflect any changes in current pricing stated in the Company's standard price manuals. The right to change pricing after 90 days is at the sole discretion of XtremeHomes. The prices shown reflect the standard XtremeHomes plans and specifications unless otherwise noted. XtremeHomes reserves the right to substitute materials of equal or better quality, consistent with the plans and specifications, without prior approval or notification to the Buyer.

5   **Payments.** Payment of All contracted goods will be via wire transfer, or certified or cashier's check. Each Payment shall be conditioned on Buyer's receipt of conditional or unconditional release and waivers of mechanics' and material suppliers' liens, duly executed by XtremeHomes, consistent with California law.   Unless specified in writing, payment of the outstanding balance (Purchase Price less any prior deposits) is due via wire transfer, or certified or cashier's check within one (1) day following when the modules are delivered.

6   **Deposits.** XtremeHomes recognizes that Mission Oaks Development, LLC is providing a $54,005.00 deposit to begin the ordering process. To execute the Authorization to Produce, XtremeHomes requires an additional deposit equal to twenty-five percent (25%) of the total Purchase Price per single family structure minus any deposits already paid to XtremeHomes. When the project is 50% complete, another (25%) is due and payable. The remaining (25%) is due upon delivery. Specially designed structures and associated components will require deposits equal to a minimum of fifty percent (50%) of the Purchase Price, or other deposits that may be required in writing from time to time by XtremeHomes reasonably proportionate to additional costs incurred by XtremeHomes. Buyer's deposits pursuant to this Paragraph will be credited toward the final amount due at delivery. Deposits and progress payments from Buyer shall be applied to prosecution and completion of the specific construction project or operation described in this Agreement and failure substantially to account to Buyer for the application or use of such funds for such construction project or operation constitutes a breach of this agreement.   All materials, supplies and assembled modular components for the specific

2.1
Page 2 of 2

construction project or operation described in this Agreement in the possession of XtremeHomes shall be subject to a lien in favor of Buyer to the full amount of deposits and progress payments made by Buyer to XtremeHomes.

7    **Warranty.** XtremeHomes warrants to the Buyer the goods contracted for in the Purchase Contract to be free from defects in material and workmanship for a period of one year from the date of shipment. An additional ten (10) year structural warranty that covers all structural components is provided by Home Buyers Warranty Corporation. Warranty coverage only applies to those contracted goods that are properly installed under accepted construction industry standards under the supervision of the Buyer. All contracted goods must be properly maintained and used for their intended purposes. XtremeHomes is not responsible for Buyer's failure to mitigate any damages caused as a result of any defect in material and/or workmanship. Should any defect in material and/or workmanship be detected by Buyer, the Buyer must notify XtremeHomes within the following time frames: (a) any missing, or non-conforming contract goods are to be reported in writing to XtremeHomes within five (5) days from the date of delivery; and (b) defects in material and workmanship are to be reported within thirty (30) days of the notice of the defect. Notice of the defect shall be defined as where a reasonable person would be apprised of the existence of a defect in the home. Buyer shall allow inspection of alleged defect by XtremeHomes' representative(s). If the defect is covered under the XtremeHomes warranty, XtremeHomes shall have the right to correct said defect by repair or replacement. Correction in the above-described manner shall constitute a fulfillment of all liabilities of XtremeHomes with regard to the quality of the contracted goods and the XtremeHomes warranty, provided corrections shall be subject to the warranties described in this Section 7. Any contracted goods that may contain warranties made by a manufacturer or a supplier to XtremeHomes are transferred to the Buyer. If said manufacturer or supplier warranty is applicable to the defect, XtremeHomes' warranty does not apply and the Buyer must exercise those warranty rights. THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN OR ORAL OR IMPLIED, INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY, WHICH ARE HEREBY DISCLAIMED.

8    **Delivery; Transfer of Risk of Loss When Property Delivered.** Seller shall be responsible for delivery of the modules and prefab components. Buyer is responsible for the installation of the contracted goods, including all necessary permits and attachment to Buyer's site. Liability for and risk of loss or damage during or after transit shall pass to Buyer when XtremeHomes delivers the contracted goods to Buyer at construction site in ~~Newcastle~~, Sonoma, California to Buyer. Buyer shall take delivery of all contracted goods on the date specified in the Authorization to Produce. XtremeHomes will provide prior written notice to Buyer of expected or actual completion date at the address and telephone number indicated on the Purchase Contract.

9    **XtremeHomes Right to Sell Undelivered Goods.** Buyer must take delivery of contracted goods at the delivery date specified in the document titled Authorization to Produce. If Buyer does not take delivery of contracted goods within fifty (50) days from the date of delivery specified in the Authorization to Produce, unless such time is extended by written agreement of the parties, which agreement for extension of delivery date shall not unreasonably be withheld, XtremeHomes reserves the right to sell the goods to another purchaser. Except as otherwise provided in this Agreement, the right to cancel and sell the goods to another purchaser is at the sole

DURING TRANSIT, CONTRACTED TRANSPORT COMPANY IS RESPONSIBLE FOR INSURING THE CONTENTS OF THE LOAD AND SHALL NAME BUYER AS AN ADDITIONAL INSURED.

discretion of XtremeHomes. Buyer is responsible for any differences between the Buyer's price and the resale price of the contracted goods and any other reasonable costs attributable to Buyer's failure to take delivery. XtremeHomes will deduct any of the aforementioned costs associated from Buyer's deposit prior to refund of any amounts due. Any deviations from this Paragraph must be in writing and the specific terms and conditions attached as a modification to this Agreement pursuant to Paragraph ~~19~~ below. If XtremeHomes must exercise the Right to Sell, the Buyer and XtremeHomes may enter a new agreement for manufacture, based on then available unit plans and pricing, or acquisition of other equivalent goods.

*/8 —*

10  **Acceptance of Contracted Goods.** Upon arrival of the contracted goods at Buyer's destination, the Buyer shall make a complete inspection and count of the contract goods and to so state the condition and acceptability of goods and/or nonconformity on the carrier's delivery receipt or other form as may be provided by XtremeHomes. Buyer's acceptance of contract goods shall be established by signature on the carrier's delivery receipt or other form provided by XtremeHomes. Said signature shall be deemed proof of Buyer's receipt and Buyer's acceptance of the XtremeHomes contracted goods. Should any defect or nonconformity of contracted goods be discovered after departure of the carrier, Buyer agrees to notify XtremeHomes in writing according to the terms and conditions of the XtremeHomes warranty stated in Paragraph 7 above.

11  **Excuse of Performance.** If any party fails to perform its obligations because of strikes, lockouts, labor disputes, embargoes, acts of God, inability to obtain labor or materials or reasonable substitutes for labor or materials, governmental restrictions, governmental regulations, governmental controls, judicial orders, enemy or hostile governmental action, civil commotion, fire or other casualty, or other causes beyond the reasonable control of the party obligated to perform, then that party's performance shall be excused for a period equal to the period of such cause for failure to perform.

12  **Taxes.** All applicable taxes are included in the total price.

13  **Building Codes and Specifications.** The contracted goods fabricated by XtremeHomes pursuant to the Purchase Contract are engineered and manufactured to meet or exceed the specifications to the approvals for our product obtained from the State of California. All specifications are provided to Buyer for review. It is the Buyer's sole responsibility to give prior written notice to XtremeHomes of any federal, state, or local codes required by the Buyer and not addressed by XtremeHomes building specifications. Buyer's written notice must be received and acknowledged prior to XtremeHomes receipt of the Authorization to Produce. If there are additional requirements beyond XtremeHomes specifications, the price and completion schedule may be subject to change. In the event Buyer fails to so notify XtremeHomes of alternative or additional code requirements or specifications prior to XtremeHomes receipt of the Authorization to Produce, XtremeHomes assumes no responsibility or liability for such non-conformance, and Buyer assumes full liability for any modifications that may be required to bring the contracted goods into compliance with said codes. XtremeHomes has the sole discretion to accept or deny the Buyer's said changes.  *AND RECEIVE A REFUND OF ITS DEPOSIT(S)*

14  **Cancellation.** Buyer may only cancel this Agreement with written notice to XtremeHomes prior to the date of execution of the Authorization to Produce. After the date of the execution of the Authorization to Produce, XtremeHomes retains the sole discretion to allow Buyer to cancel the

Agreement. Should Buyer fail to timely notify XtremeHomes in writing of cancellation, the Buyer agrees to accept all liability and costs incurred by XtremeHomes in the manufacture of the contracted goods and to consummate the contract with the acceptance of delivery and payment to XtremeHomes as agreed. In cases where cancellation is made within acceptable time frames, but where XtremeHomes has purchased special materials for the Buyer, Buyer agrees to take delivery of the special ordered materials, or to pay for the necessary restocking charges to return the materials to the supplier. Buyer shall also pay any processing and handling fees incurred to complete the cancellation of the Agreement.

15    **Limitation of Liability.** Limitation on Bringing Action. *THE PARTIES* Subject to applicable law and without waiving any rights of ~~XtremeHomes~~, any action arising directly from this Agreement must be commenced within one (1) year after the cause of action accrues. *EITHER PARTY*

16    **Exclusion of Consequential and Incidental Damages; Limitation of Damages.** In no event will ~~XtremeHomes~~ be liable for loss of profits or any special, incidental, or consequential damages, however caused, even if ~~Buyer~~ has been advised of the possibility of damages. ~~Nothing in this Agreement shall be deemed or construed to be a waiver of the immunity of XtremeHomes.~~ *THE OTHER PARTY*

17    **Cumulative Rights and Remedies.** No right or remedy given to a party on the breach of any provision of this Agreement is intended by the parties to be exclusive; each shall be cumulative and in addition to any other remedy provided in this Agreement or otherwise available at law or in equity.

18    **Modification of Agreement.** Any modification of this Agreement or additional obligation assumed by either party in connection with this Agreement shall be binding only if in writing and signed by each party or an authorized representative of each party.

19    **Assignment.** Buyer shall not assign its rights and obligations pursuant to this Agreement without the prior express written consent of XtremeHomes. Such consent XtremeHomes may withhold at its sole discretion. The foregoing not withstanding, Buyer may enter into security agreements where the modules or this contract constitute secured the collateral. Consent of XtremeHomes to any assignment shall apply only to the instance expressly provided for in the written consent, and shall not be deemed consent to any subsequent assignment.

20    **Waiver.** The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver has occurred.

21    **Indemnification.** ~~Buyer does hereby fully indemnify and hold XtremeHomes harmless from and against any and All loss, cost, claim, demand, damage, expense, and cause of action whatsoever, of whatever nature, including attorney's fees and court costs, in connection with or arising directly or indirectly out of this Agreement and/or the performance hereof.~~ Buyer shall not be required to indemnify XtremeHomes for its own negligent or willful actions.

22    **Paragraph Heading.** The headings and captions of the various terms and conditions of this Agreement are for convenience only, and they shall not

14156802381

limit, expand, or otherwise affect the construction or interpretation of this Agreement.

**23**    **Effect of Partial Invalidity.** The invalidity or ~~NOT~~ unenforceability of any particular provision of this Agreement shall affect the other provisions of this Agreement and this Agreement shall be construed in All respects as if the invalid or unenforceable provision were omitted.

**24**    **Insurance.** Buyer shall be responsible for insuring the contracted goods for risk of loss upon delivery of the contracted goods at the Buyer's jobsite.

**25**    **Notices.** Any notice provided for or concerning this Agreement shall be in writing and be deemed sufficiently given when sent certified or registered mail to the respective address of each party as set forth in the Purchase Contract.

**26**    **Connections, Permits, Changes.** Buyer shall be solely responsible for acquiring and maintaining all necessary permits, connections, changes or modifications necessary for delivery and installation of the contracted goods. Buyer's failure or inability to obtain any necessary documents shall not be construed as an excusable delay.

**27**    **Deliver Documents.** Upon the request of either party, each party shall execute and deliver such instruments, agreements, certificates, and other documents as may be reasonably required in order to implement any of the terms or provisions of this Agreement.

**28**    **DISPUTE RESOLUTION.**

     ~~29.1.~~ **28.1** Initial Dispute Resolution. If a dispute, claim or other matter in question between the parties to this Agreement arises out of or relates to this Agreement or its breach, the parties shall endeavor to settle the dispute, claim or other matter first through direct discussions between the parties' representatives, who shall have the authority to settle the dispute, claim or other matter. If the parties' representatives are not able promptly to settle the dispute, claim or other matter, the senior executives of the parties, who shall have the authority to settle the dispute, claim or other matter, shall meet within twenty-one (21) days after the dispute, claim or other matter first arises. If the dispute, claim or other matter is not settled within seven (7) days from the referral of the dispute, claim or other matter to the senior executives, the parties shall submit the dispute, claim or other matter to mediation in accordance with Paragraph ~~29.2.~~ **28.2** **28.2**.

     ~~29.2.~~ **28.2** Mediation. If the dispute cannot be settled pursuant to Paragraph ~~29.1,~~ the parties shall endeavor to settle the dispute by mediation under the current Construction Industry Mediation Rules of Judicial Arbitration and Mediation Service (JAMS) or the American Arbitration Association, as elected by the party filing for mediation, before recourse to any other dispute resolution procedures. Election of Rules shall bind the parties to the same rules in the event of arbitration under Paragraph ~~29.3.~~ **28.3** Notice of the request for mediation, filed by the initiating party, shall be filed in writing with the other party to this agreement and with JAMS or the American Arbitration Association. The request shall be made within a reasonable time after the dispute has arisen. In no event shall the request for mediation be made after the date when the institution of legal or equitable proceedings based on such dispute would be barred by the applicable statute of limitations. Selection of a mediator shall be in accordance with the applicable rules of the selected mediation service. Unless the parties otherwise mutually agree, the location of the mediation shall be in the office of the mediation service selected ~~closest to the~~ IN SAN FRANCISCO, CA.

~~Project.~~ Once one party files a request for mediation with the other party and with JAMS or the American Arbitration Association, the parties agree to conclude such mediation within sixty (60) days of filing of the request. Either party may terminate the mediation at any time after the first session, but the decision to terminate shall be delivered in person by the party's representative to the other party's representative and the mediator. Mediation fees, if any, shall be divided equally among the parties involved. If any party commences an arbitration or court action based on a dispute or claim to which this paragraph applies without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorney's fees, even if they would otherwise be available to that party in any such arbitration or court action.

~~29.3.~~ **28.3** Binding Arbitration. All disputes, claims and other matters in question between the parties to this Agreement arising out of or relating to this Agreement, or its breach, which are not settled or otherwise resolved through direct discussions or mediation pursuant to Paragraphs ~~29.1~~ and **28.1**

~~28.2~~ **28.2** ~~29.2;~~ shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of JAMS or of the American Arbitration Association then prevailing. Selection of arbitrators shall be in accordance with the rules of the selected arbitration service. Unless the parties otherwise mutually agree, the location of the arbitration shall be the office of the arbitration service ~~closest to the Project.~~ SELECTED IN SAN FRANCISCO, CA.

~~29.4.~~ **28.4** Notice of the demand for arbitration shall be filed in writing with the other party to this Agreement and with the arbitration service (JAMS or American Arbitration Association) selected by the party seeking dispute resolution. The demand shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations. The demand may be made concurrently with the filing of a request for mediation but, in such event, mediation shall proceed in advance of arbitration proceedings, which shall be stayed pending mediation for a period of sixty (60) days from the date of filing, unless made for a longer period by agreement of the parties or court order.

~~29.5.~~ **28.5** The parties shall have the right to discovery in accordance with California Code of Civil Procedure §1283.05, except for disputes, claims or matters in question involving an amount in controversy equal to or less than One Hundred Thousand Dollars ($100,000.00), in which event the parties shall limit their discovery to an exchange of documents and files relevant to the dispute and to two (2) depositions on behalf of each of BUYER ~~Owner~~ and ~~Contractor~~. X TREMEHOMES. oF

~~29.6.~~ **28.6** The award (exclusive of any punitive or exemplary damages) entered by the arbitrators shall be in accord with substantive California law, final and judgment shall be entered upon it in accordance with applicable law in any court having jurisdiction thereof. In no event shall the arbitrator be empowered to assess punitive or exemplary damages. Any punitive or exemplary damages assessed as part of an award shall not be enforceable under this Agreement.

~~29.7.~~ **28.7** Each party hereto expresses consent and agrees that any arbitration arising out of or relating to the Contract Documents, or the breach thereof, may, at the option of either party, include by consolidation, joinder, or in any other manner, other persons or entities involved in or affected by such claim, dispute, or other matter, when (1) such person or entity is substantially involved in a common question of fact or law; (2) the presence of such person or entity would help to accord complete relief in the arbitration; and (3) the interest or responsibility of such person or entity in the matter is not insubstantial. Whenever possible the Contract Documents shall contain similar provisions requiring Designers and Subcontractors for the Project to agree to consolidation, joinder or in any

other matter to permit disposition of All claims, disputes and other matters relating to the project so that complete relief is accorded in one arbitration proceeding if either party hereto so requests. This agreement to arbitrate and other agreements to arbitrate with additional persons or entities shall be specifically enforceable under the applicable law of any court having jurisdiction and such agreements shall survive the termination of this agreement.

29   **Applicable Law.** The Purchase Contract and all other supporting documentation shall be governed by and enforced in accordance with the laws of the State of California. Subject to Paragraph 16.

30   **Attorney Fees.** In the event of any arbitration or litigation relating to the project, project performance or this contract, the prevailing party shall be entitled to reasonable attorney fees, costs and expenses.

~~31~~  
32   **Entire Agreement.** This Agreement containing the terms and conditions of sale, along with the content of the face of the Purchase Contract, the Authorization to Produce and the Material Specification Riders shall constitute the entire agreement between the parties and supersedes all previous negotiations, representations, and other agreements heretofore made by the parties with respect to the subject matter of this Agreement. There are no restrictions promises, warranties, covenants, or undertakings other than those expressly set forth herein.

~~33~~  
~~32~~   **Acceptance.**

**Mission Oaks Development, LLC**

Chris Farkas  
Name  
~~NHA~~ PRESIDENT AND CEO  
Title

Signature

22 May 2008  
Date

**XtremeHomes, LLC**

Tim Schmidt  
Name  
CEO  
Title

Signature

May 21, 2008  
Date

31   INTELLECTUAL PROPERTY. ALL INTELLECTUAL PROPERTY, INCLUDING CONSTRUCTION DOCUMENTS (AS DEFINED IN THE DESIGN CONTRACT BETWEEN THE PARTIES DATED MAY 21ST, 2008), IS THE SOLE PROPERTY OF THE BUYER. UPON COMPLETION OF THE PROJECT, ALL CONSTRUCTION DOCUMENTS WILL BE DELIVERED IN DWG FORMAT AND/OR NATIVE FORMATS (VIA THE XTREMEHOMES CLIENT PORTAL), AT THE DIRECTION OF THE BUYER.

**Mark B. Aldrich**

Subject: FW: WIRE CONFIRMATION

| | | | |
|---|---|---|---|
| Status: | Completed | Message Type: | Stand |
| Create Time: | 05/27/2008 13:17:52 | Test/Prod: | Prod |
| IMAD: | 20080527 QMGFT006 002309 05271425 | | |
| OMAD: | 20080527 QMGFNP31 048064 05271425 | | |

See Audit Log for this Message

Export

Basic Information

Sender ABA {3100}:  121141615  SONO VLY BK SONO
Receiver ABA {3400}: 121142025  BUTTE COMMUNITY
Amount {2000}: 126,813.14
Type Code {1510}: 1000 - Transfer of Funds
Business Function {3600}: CTR - Customer Transfer

Institution Information

Originator {5000}
ID Code: D - DDA Account Number
Identifier:
Name: CHRISTOPHER FARKAS
Address: 3001 BRIDGEWAY BLVD K255
SAUSALITO, CA 94865

Beneficiary {4200}
ID Code: D - DDA Account Number
Identifier: 0200020717
Name: XTREMEHOMES, LLC
Address: 4801 FEATHER RIVER BLVD
OROVILLE, CA 94965

Financial Institution to Financial Institution {6500}
Text: 2227 MYERS ST
OROVILLE, CA 95966

**EXHIBIT B**

# DELIVERY TICKET
## 039
### 6999 Southfront Road
### Livermore, CA 94551

Phone: (800) 910-2771    Fax: (800) 540-5719

| Customer | Project / Ship To |
|---|---|
| **Mission Oaks Development**<br>255 West Napa Street<br><br>SONOMA, CA 95476<br>SONOMA<br>**Contact:   JASON ROE**<br>Bus: (415) 218-7418 | **Mission Oaks Development**<br><br>4801 FEATHER RIVER BLVD<br>STE 17<br>OROVILLE, CA 95965<br>BUTTE |

| Order Number      039972470 | Customer Number  45144003 | Delivery Date      9/15/2008 |
|---|---|---|
| Customer PO No. | Salesperson      039 DeBerry, Heather A. | |
| | Cust. Service Rep. Jayme Robertson | Phone Number    (925) 245-4470 |

**Delivery Instructions:  45144003**

## Options Common To The Majority Of Product

| Product Brand: | Prime Glass: | Screen: |
|---|---|---|
| Exterior Mat'l: | DGP Color/Glass: | Muntin: |
| Color: | Shade: | Hardware: |

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|
| 001<br>Location: | Study Bath | 1 | 0<br>Jamb Depth:  3 11/16" | 1735 Left Hinge Casement, Frame: 17 X 35 |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design) |
| 002 | 2 | 2 | 0 | 3096 Fixed Out-Swing French Door, Frame:30 X 95-1/2 |

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|
| **Location:** | Study | | **Jamb Depth:** 4 9/16" | |

Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp IG, 4-9/16", Fins (single unit per design)

| 003 **Location:** | 1 Study | 1 | 0 | 6096 Active/Passive Out-Swing French Door, Frame:59-1/4 X 95-1/2 |
| | | | **Jamb Depth:** 4 9/16" | |

Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp IG, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design)

| 004 **Location:** | 1/ Study | 1 | 0 | 2959 (E) Left Hinge Casement, Frame:29 X 59 |
| | | | **Jamb Depth:** 3 11/16" | |

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

| 005 **Location:** | 1 Study | 1 | 0 | 2959 Fixed Casement, Frame:29 X 59 |
| | | | **Jamb Depth:** 3 11/16" | |

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, 3-11/16", Fins (single unit per design)

| 006 **Location:** | 1 Study | 1 | 0 | 2959 (E) Right Hinge Casement, Frame:29 X 59 |
| | | | **Jamb Depth:** 3 11/16" | |

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)



| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|
| 007 Location: | 1 Great room | 1 | 0 Jamb Depth: 4 9/16" | 7296 Active/Passive Out-Swing French Door, Frame:71-1/4 X 95-1/2 |
| | | | | Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp 1G, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design) |
| 008 Location: | 1 Great room | 1 | 0 Jamb Depth: 4 9/16" | 3-Wide Fixed Door Composite |
| | | | | **Composite Value Added Items: No. of UNFINISHED Units To Be Mulled** **Composite Value Added Items: Blue Fold out Fin Applied LF** Qty = 26, Description = Blue Fold out Fin Applied LF Qty = 3, Description = No. of UNFINISHED Units To Be Mulled |
| 009 Location: | 1 Great room | 1 | 0 Jamb Depth: 4 9/16" | 7296 Passive/Active Out-Swing French Door, Frame:71-1/4 X 95-1/2 |
| | | | | Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp 1G, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design) |
| 010 Location: Above Great room | 3 | 3 | 0 Jamb Depth: 3 11/16" | 3535 Fixed Casement, Frame:35 X 35 |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp 1G, 3-11/16", Fins (single unit per design) |
| 011 Location: | 1 Loggia | | 0 Jamb Depth: 4 9/16" | 5096 Active/Passive Out-Swing French Door, Frame:50 X 95-1/2 |

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|



Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp IG, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design)

| 012 Location: | 1 Loggia | 1 | 0 | 5096 Passive/Active Out-Swing French Door, Frame:50 X 95-1/2 |

Jamb Depth:  4 9/16"



Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp IG, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design)

| 013 Location: | 1 Kitchen | 1. | 0 | 7296 Active/Passive Out-Swing French Door, Frame:71-1/4 X 95-1/2 |

Jamb Depth:  4 9/16"



Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp IG, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design)

| 014 Location: | 1 Kitchen | 1 | 0 | 2947 (E) Left Hinge Casement, Frame:29 X 47 |

Jamb Depth:  3 11/16"



ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

| 015 Location: | 1 Kitchen | 1 | 0 | 2947 Fixed Casement, Frame:29 X 47 |

Jamb Depth:  3 11/16"



ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, 3-11/16", Fins (single unit per design)

| 016 | 1 | 1 | 0 | 2947 (E) Right Hinge Casement, Frame:29 X 47 |

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|
| **Location:** | Kitchen | | **Jamb Depth:** | 3 11/16" |

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

| 017 | 1 | 1 | 0 | Right Hinge Casement, Frame:30 X 88 |
| **Location:** | Master Bedroom | | **Jamb Depth:** | 3 11/16" |

Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil Rubbed Bronze w/Butt Hinges, 3-11/16", Fins (single unit per design), Roto Optr/Lock Hdle/Butt Hinges

| 018 | 1 | 1 | 0 | 3696 Left Hinge Out-Swing French Door, Frame:36 X 95-1/2 |
| **Location:** | Master Bedroom | | **Jamb Depth:** | 4 9/16" |

Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 13/16" InsulShld Temp IG, Oil-Rubbed Bronze Hardware, 4-9/16", Fins (single unit per design)

| 019 | 1 | 1 | 0 | Left Hinge Casement, Frame:30 X 88 |
| **Location:** | Master Bedroom | | **Jamb Depth:** | 3 11/16" |

Architect Series, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil Rubbed Bronze w/Butt Hinges, 3-11/16", Fins (single unit per design), Roto Optr/Lock Hdle/Butt Hinges

| 020 | 1 | 1 | 0 | Fixed Casement, Frame:33 X 71 |
| **Location:** | Master Tub | | **Jamb Depth:** | 3 11/16" |

Architect Series, Clad, Shape 1Z Rectangle, Model 1, Brown, 5/8" InsulShld Temp IG, 3-11/16", Fins (single unit per design)

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|
| 021 Location: | 1 Master Tub | 1 | 0 | 5971 Fixed Casement, Frame:59 X 71 Jamb Depth:  3 11/16" |
| | | | | Architect Series, Clad, Shape 1Z Rectangle, Model 1, Brown, 5/8" InsulShld Temp IG, 3-11/16", Fins (single unit per design) |
| 023 Location: | 1 Her Closet | 1 | 0 | 3517 Fixed Awning, Frame:35 X 17 Jamb Depth:  3 11/16" |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, 3-11/16", Fins (single unit per design) |
| 024 Location: | 1 Bedroom #3 | 1 | 0 | 3559 (E) Left Hinge Casement, Frame:35 X 59 Jamb Depth:  3 11/16" |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design) |
| 025 Location: | 1 Bedroom #3 | 1 | 0 | 3559 (E) Right Hinge Casement, Frame:35 X 59 Jamb Depth:  3 11/16" |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design) |
| 027 Location: | 1 Bedroom #2 | 1 | 0 | 1735 Left Hinge Casement, Frame:17 X 35 Jamb Depth:  3 11/16" |

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

**028** Location: Bedroom #2 — 1 / 1 / 0 — Jamb Depth: 3 11/16"
1735 Fixed Casement, Frame:17 X 35

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, 3-11/16", Fins (single unit per design)

**029** Location: Bedroom #2 — 1 / / 0 — Jamb Depth: 3 11/16"
1735 Right Hinge Casement, Frame:17 X 35

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

**030** Location: Bedroom #2 — 1 / 1 / 0 — Jamb Depth: 3 11/16"
3559 (E) Left Hinge Casement, Frame:35 X 59

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

**031** Location: Bedroom #2 — 1 / 1 / 0 — Jamb Depth: 3 11/16"
3559 (E) Right Hinge Casement, Frame:35 X 59

ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design)

**032** — 1 / 1 / 0
3559 (E) Left Hinge Casement, Frame:35 X 59

| Item Number and Location | Quantity Ordered | Quantity Delivered | Quantity Back-Ordered | Product Description |
|---|---|---|---|---|
| **Location:** | Bedroom #1 | | **Jamb Depth:** 3 11/16" | |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design) |
| 033 **Location:** | 1 Bedroom #1 | 1 | 0 **Jamb Depth:** 3 11/16" | 3559 (E) Right Hinge Casement, Frame:35 X 59 |
| | | | | ProLine, Clad, Shape 1Z Rectangle, Model 2, Brown, 5/8" InsulShld Temp IG, Brown Screen, Oil-Rubbed Bronze Hardware, 3-11/16", Fins (single unit per design) |
| MAN1 **Location:** | 1 | 1 | 0 **Jamb Depth:** | KEYLOCKS |

Accessories held per your request.

**Out of Unit Items:**

| Description | Package ID | Item Quantity |
|---|---|---|
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | PW128570328 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | PW128570328 | 1 |
| AS FULL SCREEN CASEMENT | PW128570325 | 1 |
| AS FULL SCREEN CASEMENT | PW128570325 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | PW128570323 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | PW128570323 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | BF082009115 | 1 |
| FULL SCREEN (PROLINE CM MDL 2) | PW128570323 | 1 |

| Description | Package ID | Item Quantity |
|---|---|---|
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| RH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| LH ORB CVR & LOCK LEVR PKG | CS082012071 | 1 |
| ORB Hge Dr Active HdleLH | CS082012114 | 1 |
| ORB Hge Dr Active HdleRH | CS082012071 | 1 |
| ORB Hge Dr Active HdleLH | CS082012114 | 1 |
| ORB Hge Dr Active HdleLH | CS082012114 | 1 |
| ORB Hge Dr Active HdleRH | CS082012071 | 1 |
| ORB Hge Dr Active HdleRH | CS082012114 | 1 |
| ORB Hge Dr Active HdleRH | CS082012114 | 1 |
| ORB Hge Dr Active HdleLH | CS082012114 | 1 |
| ORB Hge Dr Active HdleLH | CS082012114 | 1 |
| ORB Hge Dr Active HdlcLH | CS082012114 | 1 |
| ORB Hge Dr Active HdleLH | CS082012114 | 1 |
| ORB Hgc Dr Active HdleRH | CS082012114 | 1 |
| ORB Hge Dr Active HdleRH | CS082012071 | 1 |
| KEYLOCK ORB, KEYED ALIKE | 039972470-127001A | 1 |
| KEYLOCK ORB, NO KEY | 039972470-129001A | 6 |
| Loose Parts for Shop Use | 0398080777 | 1 |
| 09GK1100 - Interior Mull Cvr, CM, 100" | | 1 |

# DELIVERY TICKET
### 039
**6999 Southfront Road**
**Livermore, CA 94551**

Phone: (800) 910-2771    Fax: (800) 540-5719

**Customer Name:**  Missison Oaks Development

**Pella Contract Number:** 039972470

**Comments:**

All items listed have been received:

_Steve Smith_
_____

Customer Signature

_____

Date Received

_____
Delivery Personnel

_____
Date

*Thank You For Purchasing Pella Products*

**WE APPRECIATE YOUR BUSINESS**

# COD PAYMENT SUMMARY

**039**
**6999 Southfront Road**
**Livermore, CA 94551**

Phone: (800) 910-2771    Fax: (800) 540-5719

**Customer Name:** Missison Oaks Development

**Pella Contract Number:** 039972470

| | |
|---|---|
| *Original Contract Amount* | *38,129.89* |
| *Total Deposit Amount* | *19,257.10* |

| | |
|---|---|
| Total Amount Shipped | 35,387.37 |
| | |
| | |
| Sales Tax | 2,742.52 |
| Non-taxable Subtotal | 0.00 |
| Invoice Total | 38,129.89 |
| Deposit Applied to Invoice | 19,257.10 |
| **COD Amount Due** | **18,872.79** |

✳ Custome will drop off check at
San Rafael Showroom

**Payment Method:**

| | | |
|---|---|---|
| Cash | ☐ | |
| Check | ☐ | Check No / Check Date: |
| Credit Card | ☐ | Credit Card Vendor / Number / Expiration Date: |

PAYMENT RECEIVED BY: _____

DATE: _____